IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOSEPH SZAPOWAL,**               Case Number 1:13cv2078

        Plaintiff,                         Judge James Gwin

        v.                                 Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                         REPORT AND RECOMENDATION

## INTRODUCTION

Plaintiff Joseph Szapowal seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405 (g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2 (b)(1). (Non-document entry dated September 19, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI benefits on October 20, 2010 and October 28, 2010, respectively, alleging disability due to multiple sclerosis ("MS") and depression since February 15, 2009. (Tr. 10, 227, 234, 236). His claims were denied initially and on reconsideration. (Tr. 145, 148, 158, 165). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 173). At the hearing Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 29). On May 24, 2012, the ALJ concluded Plaintiff was not disabled. (Tr. 7). Plaintiff's request for appeal was denied, making the decision of the ALJ the

final decision of the Commissioner. (Tr. 1, 6); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On September 19, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Plaintiff's Vocational and Personal Background*

Born on August 7, 1978, Plaintiff was 30 years old on the alleged disability onset date. (Tr. 21). He has a tenth grade education, general education diploma ("GED"), and prior relevant work experience as an assistant manager, playground equipment installer, auto-body worker, and metal processor. (Tr. 21, 33).

Plaintiff lived in a house and looked after his eleven-year-old son for three or four days per week. (Tr. 35-36, 290, 399). Concerning daily activities, Plaintiff drove to his son's school and the store, maintained personal hygiene, used a computer, cooked, cleaned, did laundry, socialized weekly, maintained finances, listened to music, fished, and camped. (Tr. 35-36, 290, 322, 406-07, 438).

Plaintiff testified insomnia, depression, sudden severe pain, difficulty gripping, incontinence, headaches, and loss of memory kept him from working. (Tr. 45-46, 48, 51, 56, 58). He described his symptoms as variable and said he experienced fewer "pains" since he stopped taking his MS medication. (Tr. 46, 58-59). At a previous job, Plaintiff said his boss used post-it notes to remind him what to do. (Tr. 53).

In a pain questionnaire completed on January 11, 2011, Plaintiff indicated his symptoms included numbness, tingling, twitches, pain, weakness, lack of feeling, depression, laziness, sleeplessness, anxiousness, and headaches. (Tr. 361-62). He described these symptoms as "annoying and persistent" and said they were usually random, but sometimes triggered or worsened by the weather. (Tr. 361).

In September 2011, Plaintiff said his arms, legs, fingers, and toes were affected by hot and cold weather. (Tr. 399). He said he had decreased feeling in his fingers; severe, sudden, and short-lived pain in his abdomen; multiple daily headaches; light headedness and dizziness; twitching; shaking; anxiety; mood swings; depression; and insomnia. (Tr. 399). He worked about twenty hours per week assisting a painter during this time. (Tr. 399).

*Medical Evidence*

From December 5, 2007 through October 29, 2009, Plaintiff sporadically treated with Larry H. Dashefsky, M.D., for symptoms related to MS and lower extremity paresthesias. (Tr. 424-35). Dr. Dashefsky managed Plaintiff's medication regimen during these visits. *Id*.

Dr. Dashefsky reported on May 10, 2010 that Plaintiff had not followed-up as requested since October 2009. (Tr. 478). Plaintiff said he was working part-time and his MS medication (Rebif) was helping. (Tr. 478). Dr. Dashefsky refused to refill Plaintiff's medications until he came into the office and completed blood work and an MRI. (Tr. 478-79).

On September 1, 2010, Plaintiff saw Mary R. Rensel, M.D., stating his sister "made" him go. (Tr. 492). He said he did not care what his MRI revealed, did not follow-up with his labs as ordered by Dr. Dashefsky, and stopped taking Rebif because he did not have a prescription. (Tr. 492). According to Plaintiff, MS "wrecked his life", Rebif made him depressed, and he had a history of suicidal ideation. (Tr. 492). Plaintiff complained of sleep disturbance, fatigue, numbness in his fingertips, difficulty holding on to small objects, and difficulty with memory and concentration. (Tr. 492). He was working part-time at an auto body shop at the time of examination. (Tr. 492). A physical examination was generally normal and Dr. Rensel diagnosed MS. (Tr. 493-94). She said Plaintiff was clinically stable on Rebif but was noncompliant with

3

treatment. (Tr. 494). She recommended Plaintiff get an MRI and lab work then prescribed Celexa for depression and Ambien for sleep disturbance. (Tr. 495).

Plaintiff followed-up with Dr. Rensel on September 29, 2010. (Tr. 488). Dr. Rensel noted Plaintiff's September 2010 MRI revealed an increase in the lesion load on the brain. (Tr. 488). Plaintiff said he avoided taking Rebif because it caused more pain, fatigue, and depression. (Tr. 488). Plaintiff said Ambien helped with sleep disturbance and he was taking Celexa regularly. (Tr. 488). Dr. Rensel discontinued Plaintiff's Rebif prescription. (Tr. 488).

On November 8, 2010, Plaintiff's boss Russell N. Conley, Sr., completed a work activity questionnaire, indicating Plaintiff was able to complete all the usual duties required as a body man apprentice without special assistance and that he regularly reported for work as scheduled. (Tr. 247). However, Mr. Conley said Plaintiff completed tasks slower than other employees, operated at 60% of other employees' productivity, and had fewer or easier duties, lower production standards, and extra help or supervision. (Tr. 247-48). Mr. Conley indicated Plaintiff was not frequently absent from work and was able to complete the work with extra help, supervision, fewer and easier duties, frequent rest periods, or lower production requirements. (Tr. 249). However, he said Plaintiff's work was not satisfactory when compared to another employee in a similar position. (Tr. 249).

On March 9, 2011, Plaintiff told Kathleen Schwetz, RN, MS, CNS, that he recently had a lot of anxiety because his girlfriend had a miscarriage. (Tr. 515). Nurse Schwetz increased Plaintiff's Celexa dosage, provided a trial of Lunesta, and referred him for psychological treatment. (Tr. 516).

On March 29, 2011, Plaintiff told Dr. Rensel Celexa and Ambien had lost their effectiveness but feeling had returned to his fingers. (Tr. 515). Plaintiff said work kept him active

and his physical examination was generally normal. (Tr. 515-16). Dr. Rensel described Plaintiff's MS as stable, increased his dosage of Celexa, suggested Plaintiff see a counselor, and discontinued his prescription for Ambien in favor of one for Lunesta. (Tr. 516).

On April 13, 2011, Plaintiff resumed taking Rebif and complained of only "mild fleeting pains" with less fatigue. (Tr. 512-13). Again, Plaintiff's physical examination was normal, he continued to work in construction, and said his mood had improved due in part to a new puppy and new house. (Tr. 512-13). Plaintiff had cancelled his psychological consultation and never started antidepressants. (Tr. 512). Plaintiff was taking Ambien as needed rather than Lunesta to save money; Dr. Rensel recommended he take Benadryl as needed instead. (Tr. 513).

On July 18, 2011, Plaintiff had an initial psychological evaluation with John S. Vitkus, Ph.D., where he complained of depressed mood related to his MS diagnosis but said his symptoms had recently improved. (Tr. 562). At the time, he worked as a house painter. (Tr. 562). Plaintiff's mental status examination was unremarkable aside from a mild to moderately depressed mood and moderate anxiousness. (Tr. 563). Dr. Vitkus recommended biweekly therapy and assigned a global assessment of functioning ("GAF") score of 60.[1] (Tr. 564).

Plaintiff followed up with Dr. Vitkus on August 8, 2011; October 27, 2011; and January 26, 2012. (Tr. 565, 567, 569). Generally, Dr. Vitkus noted Plaintiff had mild to moderate depression and anxiety with a mildly restricted or blunted affect, goal-directed thoughts, and no suicidal or homicidal ideations. *Id*. Plaintiff complained of feeling "scatterbrained" at times, but

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34.

said he had no difficulty with forgetfulness when it came to high motivation topics, especially caring for his son. (Tr. 569).

Plaintiff reported to Dr. Rensel on October 26, 2011 that he was running about seven miles per week in the summer, had "hit and miss" fatigue and trouble falling asleep, new onset alopecia on his scalp, and random, brief, sharp, stabbing headaches. (Tr. 538). After a generally normal physical examination, Dr. Rensel said Plaintiff's MS was stable and he was tolerating Rebif well. (Tr. 539). Although he continued to be depressed, he was seeing a psychologist. (Tr. 539). Dr. Rensel indicated Plaintiff's alopecia needed further evaluation. (Tr. 539).

On December 1, 2011, Plaintiff's mother submitted a letter stating Plaintiff used to be energetic and loved to fish, hunt, camp, and go to concerts until he got MS. (Tr. 398). She expressed concern about his depression, tendency to isolate himself, and noncompliance with medication. (Tr. 398). She described witnessing Plaintiff drop to the floor in pain and experience headaches and short term memory loss, low patience, and difficulty concentrating. (Tr. 398).

On November 30, 2011, Plaintiff's sister said she had become increasingly concerned for her brother's well-being, specifically with regard to insomnia; ability to manipulate, walk, and see; tendency to isolate himself; loss of job, friendships, and family relationships; and moodiness. (Tr. 408).

On January 12, 2012, physical therapist Matt Sutliff evaluated Plaintiff. (Tr. 550). Plaintiff said he could stand for one-to-two hours, sit for two hours, squat twenty-to-thirty times, climb a flight of thirteen stairs four times, reach twenty times, and kneel for one hour but due to lightheadedness, could not bend. (Tr. 552). Plaintiff said he was an ordained minister and earned 50-75 dollars to complete a marriage. (Tr. 551). Following a 180-minute examination, Mr. Sutliff

determined Plaintiff could perform a range of light work. (Tr. 552-46). He added a climate-controlled environment "may improve" Plaintiff's vocational potential. (Tr. 556).

Dr. Vitkus assessed Plaintiff's mental ability to perform work-related activities on January 31, 2012. (Tr. 558). He found Plaintiff experienced significant loss in memory and concentration as well as fatigue resulting in the need for simple tasks with frequent breaks. (Tr. 559). He expected Plaintiff to be absent from work more than four times per month as a result of MS and depression. (Tr. 560).

Plaintiff's former boss, friend, and owner of HICAA Industries, Jonathan Gaia, wrote on January 27, 2012 that Plaintiff worked for him as an independent contractor from July 2011 through November 2011, but Plaintiff had been hired for fewer jobs as the year progressed. (Tr. 409-10, 412). Plaintiff was terminated because he could not complete the job in a satisfactory manner within the allotted time frame due to extreme fatigue and poor coordination and balance. (Tr. 410, 413).

On February 23, 2012, Plaintiff saw Anne Rex Torzok, D.O., with complaints of daily, penetrating, and constant lower back pain that began two or three years ago but for which he had never sought treatment. (Tr. 571). He said he had no leg pain, numbness, or tingling and had stopped taking medication for MS because he was better off without it. (Tr. 572). Examination revealed only paraspinal hypertonicity and spasm throughout the lumbosacral junction, tenderness to palpation at L4-S1, and increased pain in extension. (Tr. 572-73). Dr. Torzok recommended therapy and suggested Plaintiff follow-up as needed. (Tr. 573).

Plaintiff saw Thomas B. Torzok, D.C., on February 27, 2012 with complaints of chronic lower back pain. (Tr. 576). An x-ray revealed a normal lumbar spine and Dr. Torzok recommended conservative treatment. (Tr. 577).

***State Agency Review and Examination***

On November 13, 2009, consultative examiner Jeff Rindsberg, Psy.D., examined Plaintiff and assessed his mental status and current psychological functioning. (Tr. 436). Dr. Rindsberg said Plaintiff was in the middle of a divorce and dealing with a 2007 diagnosis for MS. (Tr. 436). According to Plaintiff, his mood was improving. (Tr. 436-37). Plaintiff did not believe he had any major mental health problems, although he did say he suffered from depression and mild mood swings. (Tr. 437). Plaintiff's appearance, behavior, flow of conversation, thought process, mental content, insight, judgment, and sensorium and cognitive functioning were normal. (Tr. 437-38). Plaintiff said he was usually upbeat, although his sleep was "not that great". (Tr. 438). He said he enjoyed fishing, and had been doing it more than usual lately. (Tr. 438). He expressed concerns over MS getting progressively worse and felt nervous during the evaluation. (Tr. 438). He said his biggest "day-to-day" problem was finding a job. (Tr. 438). Dr. Rindsberg concluded Plaintiff was "functioning fine" without any serious symptom severity or impairment. (Tr. 439).

David Demuth, M.D., reviewed Plaintiff's records and completed a psychiatric review technique on December 11, 2009, concluding Plaintiff had no medically determinable impairment. (Tr. 441-53).

On December 16, 2009, consultative examiner Wilfredo M. Paras, M.D., examined Plaintiff and considered his symptoms, work history, and generally normal physical examination. (Tr. 456-61). Dr. Paras' impression was for MS with manifestations of numbness and tingling that occurred periodically and some blurring of vision. (Tr. 457). He found Plaintiff's ability to perform work-related physical activities would be limited by the manifestations of MS, which consisted mainly of episodes of numbness and tingling. (Tr. 457). Dr. Paras added Plaintiff complained of depression and would be suited for light work. (Tr. 457).

8

On February 10, 2010, state agency medical consultant William Bolz, M.D., reviewed Plaintiff's medical record and found he had the physical residual functional capacity ("RFC") to lift or carry up to 50 pounds occasionally and 25 pounds frequently; stand, walk, and/or sit for about six hours in an eight-hour workday; and push or pull without limitation. (Tr. 462-69).

Consultative examiner Joseph Konieczny, Ph.D., examined Plaintiff on February 4, 2011, and diagnosed him with depressive disorder. (Tr. 504). Following an interview with Plaintiff, Dr. Konieczny concluded Plaintiff had no impairment in abilities to concentrate and attend to tasks or to understand and follow directions. (Tr. 501-04). He had a moderate impairment in abilities to withstand stress and pressure, relate to others, and deal with the general public. (Tr. 503-04). He had fair insight and no deficits in awareness of rules of social judgment and conformity or overall level of judgment. (Tr. 504).

On February 9, 2011, state agency medical consultant Paul Tangeman, Ph.D., reviewed Plaintiff's records and found Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms was moderately limited as was his ability to respond appropriately to changes in the work setting. (Tr. 86-87). He was not significantly limited in any other area of mental functioning, including ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary routine without supervision. (Tr. 86-87). Dr. Tangeman concluded Plaintiff maintained the capacity to perform three-to-four step tasks in a static work environment. (Tr. 87).

State agency medical consultant John Waddell, Ph.D., reviewed Plaintiff's records and opined on June 20, 2011 that Plaintiff's ability to withstand stress and pressure showed

indication of moderate impairment due to depression and he would be best in a routine and predictable work setting. (Tr. 114-15).

*ALJ Decision*

On May 24, 2012, the ALJ determined Plaintiff had severe impairments of MS and depression. (Tr. 12). The ALJ found these impairments alone and in combination did not meet or medically equal a listed impairment. (Tr. 13). Next, the ALJ determined Plaintiff had the RFC to perform a range of light work with the following restrictions: Plaintiff could frequently finger and handle bilaterally; perform simple and more complex tasks in an environment with routine changes; ask questions appropriately in a work setting; understand four and five-step instructions; perform work with no strict production quotas and with frequent contact with the general public, co-workers, and supervisors; and would be expected to be off task five percent of the time. (Tr. 15). Based on Plaintiff's age, education, work experience, and RFC, the ALJ concluded Plaintiff could perform work as a sales attendant, counter clerk, or packer; therefore, he was not disabled. (Tr. 21-23).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r*

10

*of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if

11

he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the RFC is unsupported by substantial evidence and the ALJ failed to provide good reasons for affording Dr. Vitkus' opinion great weight. (Doc. 14). Each argument is addressed in turn.

*RFC*

Plaintiff raises several arguments regarding the RFC determination. A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545; 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. §§ 404.1529; 416.929. An ALJ must also consider and weigh medical opinions. §§ 404.1527; 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *1.

First, Plaintiff claims there was no evidence to support the ALJ's finding that Plaintiff would be off task five percent of the time. (Doc. 14, at 12). However, as the Commissioner points out, the ALJ's finding is supported by the treatment notes and opinions of Drs. Vitkus, Konieczny, Tangeman, and Waddel; who all found Plaintiff did not have significant restrictions staying on task. (Doc. 15, at 14-15). Indeed, Dr. Vitkus consistently found Plaintiff's memory was intact, he had average to above average intelligence, good fund of knowledge, and goal-directed thoughts. (Tr. 564-69). Dr. Vitkus reported that although Plaintiff felt scatter-brained at times, he had no deficits when it came to "high motivation topics", such as caring for his son.

12

(Tr. 569). As the ALJ noted, these treatment notes are inconsistent with Dr. Vitkus' opinion suggesting Plaintiff would have difficulty understanding, remembering, and carrying out complex job instructions for half of an eight-hour workday. (Tr. 17).

Additionally, Drs. Konieczny and Tangeman found Plaintiff had no impairment in abilities to concentrate, attend to tasks, and understand and follow directions. (Tr. 86-87, 501-04). However, the ALJ adopted a more restrictive RFC, finding Plaintiff had a moderate limitation in ability to maintain attention and concentration. As the ALJ pointed out, Dr. Waddell opined that Plaintiff was not precluded from completing routine and repetitive tasks that did not require a rapid or consistent pace and added he would do best in a routine and predictable setting. (Tr. 13, 19, 114-15).

Further, the ALJ considered additional evidence of record to find Plaintiff did not have more than a moderate limitation in ability to maintain attention, concentration, persistence, or pace. He found Plaintiff could understand and follow the hearing proceedings closely and fully without any observable difficulty and he responded to questions in an appropriate manner. (Tr. 14). Moreover, the ALJ noted Plaintiff was able to maintain concentration and attention to complete his activities of daily living, including attend to personal care; perform household chores such as cooking, cleaning, and laundry; work on the computer; visit his girlfriend and son; assist friends with chores and errands; participate in routine driving; perform his own shopping; care for his son under a shared parenting agreement; and manage his own finances. (Tr. 13-14, 35-36, 290, 322, 406-07, 438). The ALJ also considered Plaintiff's testimony and third party reports of Plaintiff's mother and boss. (Tr. 13, 19).

13

In sum, for the reasons stated by the ALJ and summarized above, the ALJ's RFC determination finding Plaintiff would be off-task five percent of the time is supported by substantial evidence.

Next, Plaintiff claims the ALJ erred by not evaluating third party statements completed by former employers. (Doc. 14, at 15). He argues the ALJ's summary rejection of the third party statements as a whole, without further explanation, violated relevant regulations.

The regulations provide an ALJ "may . . . use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." 20 C.F.R. §§ 404.1513; 416.913. "Other sources" include non-medical sources such as "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy." §§ 404.1513(d)(4); 416.913(d)(4). SSR 06-03p, 2006 WL 2329939, clarifies how the ALJ considers opinions from sources who are not "acceptable medical sources" under the regulations. SSR 06-03p explains that certain factors should be used to weigh opinions of non-medical sources, including: "the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id.*, at *6.

Here, the ALJ considered the third party reports, but found they were inconsistent the record including the opinion of consultative examiner Dr. Konieczny, Plaintiff's activities of daily living, the ALJ's own observations during the hearing, and Dr. Vitkus' treatment notes – all of which are described above. (Tr. 14). Moreover, as the Commissioner points out, the ALJ afforded the opinions at least some weight because he found Plaintiff was not able to complete past relevant work. (Tr. 20-21). In short, the ALJ adequately explained his reasons for discrediting the reports of "other sources".

14

Last, Plaintiff claims the ALJ erred by not limiting Plaintiff to work in a climate controlled environment. (Doc. 14, at 15-16). As support, Plaintiff points to his own "uncontradicted testimony . . . that weather affected his symptoms" and Mr. Sutliff's recommendation that Plaintiff work in a climate controlled environment. (Doc. 14, at 15-16).

However, the ALJ found Plaintiff's testimony was less than credible; a finding that stands unchallenged on review. (Tr. 19). Further, the ALJ considered Mr. Sutliff's opinion and afforded it great weight except he found Mr. Sutliff's comment that Plaintiff needed a climate controlled environment unpersuasive in light of evidence that Plaintiff ran seven miles per week during the summer. (Tr. 17). Most important, the ALJ indicated Mr. Sutliff found only that a climate-controlled environment "may improve" his vocational potential. (Tr. 17, 556). Indeed, Mr. Sutliff found Plaintiff was capable of light work, and that climate control may help exceed that ability. (Tr. 556). Notably, no physician of record found Plaintiff would require a climate-controlled environment. As a practical matter, the positions of sales attendant, counter clerk, and packer are generally indoor positions. For these reasons, Plaintiff's contention regarding climate control is not well-taken.

Following close and careful review, the undersigned recommends the Court find the RFC determination limiting Plaintiff to a range of light work supported by substantial evidence, including treatment notes, opinion evidence, third party reports, and Plaintiff's testimony, credibility, and activities of daily living.

### Treating Physician Rule

Next, Plaintiff challenges the ALJ's reasons for affording Dr. Vitkus' opinion great weight. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir.

2007); *see also* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

The ALJ afforded Dr. Vitus' opinion great weight, as follows:

Dr. Vitkus completed a Medical Assessment of Ability to Sustain Work-Related Activities questionnaire on January 31, 2012 (Exhibit 14 F). Dr. Vitkus indicated that the claimant has some limitations in making occupational adjustments, some limitations in making performance adjustments, and few limitations making

16

personal-social adjustments. He also stated that the claimant would be absent from work more than four times per month due to his depression and MS. Dr. Vitkus found the claimant most limited in his ability to function independently and in his ability to maintain attention/concentration. He indicated that the claimant has moderate to severe anxiety and depression. The undersigned gave great weight to Dr. Vitkus's opinion with three exceptions. The undersigned finds that the evidence does not support that the claimant is as limited in his ability to understand, remember, and carry out complex job instructions as Dr. Vitkus indicated (50% of an 8-hour workday). In addition, the undersigned finds that the claimant's anxiety and depression are not in the moderate to severe range. Finally, the evidence does not support the claimant would be absent from work more than four times per month. Notably, the claimant did not demonstrate any difficulties with concentration, attention, persistence and pace when evaluated by Dr. Konieczny. Moreover, the claimant engages in activities, as discussed previously, that show that he is not so limited. Also, the claimant's GAF of 60-65 does not support Dr. Vitkus's indication that the claimant has moderate to severe anxiety and depression. Finally, the claimant's medical records do not show that he requires frequent treatment or that he has symptoms of a severity that would cause him to be absent from work as frequently as Dr. Vitkus found.

(Tr. 17-18).

Upon review, the ALJ complied with his regulatory obligation to provide good reasons, as indicated above. Among these reasons, the ALJ discussed the evidence of record, including Dr. Konieczny's opinion, Dr. Vitkus' own treatment notes, Plaintiff's activities of daily living, and the supportability of Dr. Vitkus' opinion in light of the assignment of a GAF score indicating only moderate impairments.

Plaintiff's attempt to counter the ALJ's reasons with contradictory evidence from the record is not persuasive where the standard on review is only whether the decision is supported by substantial evidence. Indeed, even if substantial evidence, or even a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

In addition, Plaintiff's argument that the ALJ failed to consider Dr. Vitkus' opinion that the variability of Plaintiff's MS and depression would lead to his being absent four or more times

17

per month is not well-taken. (Doc. 14, at 13). As explained, the ALJ provided good reasons for rejecting that part of Dr. Vitkus' opinion.

Moreover, there is a difference between medical opinions and the RFC; the ALJ, not a medical source, is tasked with making the latter determination. 20 C.F.R. §§ 404.1546(c), 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."). Indeed, the two assessments are not synonymous, and need not be identical to be compatible. SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must be equated with the administrative finding known as the [RFC] assessment."). Therefore, the ALJ was under no obligation to incorporate each of Dr. Vitkus' findings into the RFC determination.

For the reasons stated herein, the undersigned finds ALJ did not err in his treatment of Dr. Vitkus' opinion and his decision is supported by substantial evidence.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the undersigned recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified

time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).